**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**RICKY LYNN THRASHER**

       **Plaintiff,**

**v.**                            **Case No. 3:03cv437/RV**

**VERTEX AEROSPACE, LLC fka**
**RAYTHEON AEROSPACE, LLC,**

       **Defendant.**
_____/

## ORDER

    Pending is the defendant's motion for summary judgment.  (Doc. 33).

    In this action, plaintiff Ricky Lynn Thrasher has filed a two-count complaint against defendant L-3 Communications Integrated Systems Aerotech, LLC [formerly known as either Vertex Aerospace, LLC or Raytheon Aerospace, LLC].  The plaintiff alleges retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 [42 U.S.C. § 2000e, et seq.], and in violation of the Florida Civil Rights Act  [Chapter 760, Florida Statutes].  The parties having had a full opportunity for discovery, the defendant now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Unless otherwise noted, the following facts appear to be undisputed.

**I.**    **FACTUAL BACKGROUND**

    Plaintiff Ricky Lynn Thrasher is a white employee of defendant L-3 Communications Integrated Systems Aerotech, LLC ("L-3") at Naval Air Station Whiting Field near Milton, Florida.  He works in the logs and records department for L-3.  The logs and records department has only a few employees and is a relatively small part of L-3's operations at Whiting Field.  In January of 2001, Thrasher nominated a black co-employee in the department, Elijah Snipes, for an employee of

the quarter award.   When Snipes did not win, Thrasher complained to L-3 management that he thought the employee of the quarter selection process was racially discriminatory.   In February of 2001, following Thrasher's complaint of racial discrimination to L-3 management, Thrasher requested to attend a safety class sponsored by the company, but his request was denied.   A few months later, in August of 2001, Thrasher applied for a hazardous material safety training position available within L-3, a job which would have carried with it increased pay and responsibilities, but L-3 selected another employee to fill the position.     In October of 2001, Thrasher applied for a job within L-3 as a maintenance control supervisor, but again he was not selected.

Because Thrasher felt that he was qualified for both positions, he contacted L-3's corporate office in Mississippi in November of 2001, and complained, for the first time, to corporate management that the January employee of the quarter selection had been motivated by racially discriminatory animus, and that he was being retaliated against for complaining to his supervisor about the alleged discrimination.   In response, the corporate office sent an investigator to interview Thrasher concerning his allegations of discrimination and retaliation.

Soon thereafter, in late November of 2001, Thrasher requested eight hours of vacation leave for the day before Thanksgiving.   However, according to L-3 management, Thrasher was required to give three days prior notice before vacation leave would be granted, and Thrasher did not submit this November of 2001 vacation request within the three-day deadline.  Since Thrasher was not working on the day that his supervisor, Bill Bailey, reviewed Thrasher's leave request.   Bailey decided to call Thrasher at home to advise him that his request was denied.  Bailey contends that Thrasher became verbally abusive on the phone and used foul language with him.   As a result of this phone conversation, Thrasher was suspended for five days.   Specifically, L-3's stated reason for suspending Thrasher

was that he used foul and abusive language toward his supervisor in violation of employee rules of conduct.   Thrasher contends that he did not use abusive and foul language, and that his supervisor fabricated the whole incident in order to retaliate against him.   Thrasher filed a grievance with his union challenging the suspension, and the union and the company ultimately agreed that three days would be lifted off the suspension, so that Thrasher was only penalized two days of unpaid leave.[1]

Thrasher returned from his suspension on December 10, 2001.   On that same day, he suffered a work-related injury, after falling down a flight of stairs on the job.  As a result, Thrasher remained on workers' compensation leave for more than six months: from December 10, 2001, until his return to work on May 15, 2002.  A few days after Thrasher returned to work following his disability leave, he discovered that his name had been removed from a list of qualified employees who were certified to perform weight and balance analysis.  He also discovered on his return from disability leave that Elijah Snipes had been demoted in his absence. Before that time, Snipes had served in the "Lead A" position, which is an employee position responsible for distributing and overseeing job assignments of other employees.

Thrasher immediately went to his supervisors and complained that Snipes' demotion was based on racial discrimination.[2]    A few days later, Thrasher's

---

[1] Obviously, this is a disputed matter.  According to L-3 management, the union supported L-3's decision to suspend the plaintiff, and agreed that disciplinary action was appropriate, but the union asked L-3 to reduce the suspension from five days to two days.  Thrasher contends that the union did not agree with L-3's decision to suspend him.

[2] L-3 asserts that Snipes was demoted following an audit of thirty-eight areas within the company.  According to L-3, five of the areas were found deficient and four of those areas fell directly under Snipes.  Plaintiff contends Snipes was treated differently following the audit, in that other similarly situated white employees were not demoted.

supervisor counseled him for not taking lunch breaks.  Apparently, Thrasher had returned to only part-time limited duty at that time, and he was skipping his lunch break in order to leave work earlier.  His supervisor counseled him and advised him to take his lunch break instead of leaving work at an earlier time.[3]   About July 30, 2002,[4] Thrasher again contacted the corporate office, but this time to report what he believed to be racially and sexually offensive material which was being distributed throughout the logs and records office at Whiting Field.  For instance, Thrasher reported that his supervisor had sent a racially offensive joke to multiple employees, and several supervisors were downloading sexually explicit videos and e-mails from the Internet, leaving the downloaded material readily accessible to other employees.

In mid-August of 2002, Thrasher was temporarily transferred from the day shift to the night shift in order to facilitate the training of a new employee. Thrasher's supervisors explained to him that Cheryl Pinko, the newly selected Lead A, was slotted to train the employee, but since it was necessary that Pinko remain on the day shift to fulfill her Lead A and training duties, Thrasher would have to temporarily transfer to the night shift so Pinko could do the training.  Not satisfied with this explanation, Thrasher complained about the shift-transfer to the corporate office on August 13, 2002.  He also complained to the corporate office on August 16, 2002, that L-3's supervisors were retaliating against him for reporting the

---

A dispute regarding whether Snipes was demoted due to racial discrimination, however, is not material to plaintiff's present retaliation claim.

[3]  It is unclear whether the counseling was merely verbal or was a written reprimand. Aside from the allegation in the complaint and a brief reference to the counseling in plaintiff's affidavit, the plaintiff fails to offer any evidence on the counseling.

[4]  From 2001 to 2004, Plaintiff filed over 16 grievances and complaints to L-3's corporate office, each triggering an automatic investigation pursuant to company policy.

alleged sexual and racial discrimination.   Nevertheless, Thrasher was transferred back to day-shift immediately following the training of the new employee, which lasted approximately six weeks.

On August 13, 2002, Thrasher also requested five days of vacation time for the period August 19, 2002, through August 23, 2002.   L-3 denied Thrasher's leave request, citing a provision in Thrasher's collective bargaining agreement, which required employees to give at least seven days advance notice for vacation requests over eight hours.  Following the denial of his 5-day vacation leave request, Thrasher attempted to obtain approval to take only eight hours of vacation for the following Friday, instead of the full week of vacation.  Thrasher's supervisor denied this request, as well, stating that based upon personnel availability, prior approved requests by others, and work load considerations, Thrasher's vacation leave had to be denied.[5]   At the same time, Thrasher also submitted four other vacation leave requests for each Friday of every week for the four weeks following August 23, 2002.[6]   These vacation requests were approved, except a request for September 13, 2002.   Thrasher's supervisor stated that Thrasher completed the wrong form when submitting the September 13th request, and denied it on that basis.

On September 10, 2002, Thrasher filed a charge of discrimination with the Equal Employment Opportunity Commission and the Florida Commission of Human Relations.  In his administrative complaint, Thrasher complained that his suspension in November 2001 was in retaliation for his earlier complaint of racial discrimination, relating to the 2001 Employee of the Quarter award.   Thrasher also complained that the denial of his leave requests and his transfer to another shift

---

[5] Thrasher disputes that this is the actual reason his vacation request was denied.

[6] In other words, on August 16, 2002, Thrasher submitted a total of five separate leave requests for the following five Fridays.  Each leave request was for a period that did not exceed eight hours.

were in retaliation for his complaint to corporate management of racially derogatory e-mails and jokes that were circulating around the office.   Thrasher amended his charge of discrimination on February 12, 2003, alleging that the earliest date of discrimination took place in January of 2001.   After receiving a right to sue letter from the EEOC, Thrasher filed this action alleging retaliation.

## II.   DISCUSSION

### A.   Summary Judgment Standard

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265, 273 (1986);  see also Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996).

However, summary judgment is improper "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 594 (11th Cir. 1995).  An issue of fact is "material" if it might affect the outcome of the case under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202, 211 (1986).  It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party.  See id.; see also Matsushita

Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986).

Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact.  See Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000); Ramsey v. Leath, 706 F.2d 1166, 1170 (11th Cir. 1983). On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party.  Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir. 1999).

In employment discrimination cases, the court should consider "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." Reeves v.  Sanderson Plumbing Products, 530 U.S. 133, 148-151, 120 S.Ct.  2097, 147 L. Ed.2d 105 (2000).

**B.      Exhaustion of Administrative Remedies**

Title VII sets forth certain statutory prerequisites which a plaintiff must satisfy before filing a Title VII action.  See e.g., 42 U.S.C. §2000e-5(e)(1).   For instance, it is well established that a plaintiff, before instituting a Title VII action in federal court, must file a charge of discrimination with the EEOC. Id.; Forehand v. Florida State Hospital, 89 F.3d 1562, 1567 (11th Cir. 1996).  The purpose of this requirement is that the EEOC "should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts."   Evans v. United States Pipe & Foundry Co., 696 F.2d 925, 929 (11th Cir. 1983).  See also Wu v. Thomas, 863 F.2d 1543, 1548 (11th Cir. 1989)("The purpose of the filing requirement is to insure 'that the settlement of grievances be first attempted through the office of the EEOC.'"(quoting Oatis v. Crown Zellerbach Corp., 398 F.2d 496, 498 (5th Cir.

1968)).  Another important purpose of the charge requirement is that it serves to notify the employer of the allegations made against it.  Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1319 (11th Cir. 2001).

However, in light of Title VII's remedial purpose, a Title VII action does not have to be based solely on the specific complaints made by the employee's initial EEOC charge.  Rather, it also can be based upon "any kind of discrimination like or related to the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination."  Chanda v. Engelhard/ICC, 234 F.3d 1219, 1225 (11th Cir. 2000); See also Alexander v. Fulton County, Ga., 207 F.3d 1303 (11th Cir. 2000); Mulhall v. Advance Sec., Inc., 19 F.3d 586, 589 n.8 (11th Cir. 1994); Wu v. Thomas, supra, 863 F.2d at 1547;  Baker v. Buckeye Cellulose Crop., 856 F.2d 167, 169 (11th Cir. 1988).  In this case, L-3 contends that several allegations in plaintiff's Title VII complaint fall beyond the scope of Thrasher's EEOC charge.

"The starting point for determining the permissible scope of the judicial complaint is the EEOC charge and investigation."  Evans v. U.S. Pipe & Foundry Co., supra, 696 F.2d at 929.  In his first EEOC charge of retaliation, Thrasher complained of four adverse employment actions: (1) his November 28, 2001, suspension: (2) the disciplinary notice he received on May 30, 2002; (3) the denial of his vacation leave requests, and (4) the temporary change of his shift.  The overall import of Thrasher's first EEOC complaint indicates that the first retaliatory act identified his suspension on November 28, 2001.  For example, Thrasher begins his charge with, "continuing from my 5 day suspension on 11/28/01 to date, I have been subjected to various discriminatory acts."   Further, Thrasher noted November 28, 2001, as the earliest date discrimination took place.   Thrasher amended his EEOC charge on February 12, 2002.  In his second charge, Thrasher claimed January 1, 2001, as the earliest date the discrimination took place, but he alleged

no new allegations of discrimination or retaliatory conduct that occurred between January 1, 2001, and November 28, 2001.   Instead, the amended charge reiterated the same retaliatory acts outlined in the first EEOC charge.

Despite referring in his EEOC charge only to retaliatory acts which occurred after November 28, 2001, Thrasher's Title VII complaint includes several allegations of retaliatory conduct which occurred prior to that time: (1) the denial of an opportunity to attend a safety class in February of 2001; (2) the denial of a promotion in August of 2001; and (3) the denial of another promotion in October of 2001.

The Eleventh Circuit has cautioned that "judicial claims are allowed if they 'amplify, clarify, or more clearly focus' the allegations in the EEOC complaint, but . . . allegations of new acts of discrimination are inappropriate." Gregory v. Georgia Department of Human Resources, 355 F.3d 1277, 1279-80 (11th Cir. 2004)(citing Wu v. Thomas, supra, 863 F.2d at 1547); See also Ray v. Freeman, 626 F.2d 439, 443 (5th Cir. 1980)("Allegations of new acts of discrimination, offered as the essential basis for the requested judicial relief, are not appropriate.")  In this case, the retaliatory acts now alleged in Thrasher's Title VII case, but not alleged in his EEOC charge, consist of entirely new claimed acts of retaliation.  The retaliatory acts which allegedly occurred prior to November of 2001 must necessarily be based on some prior complaint of racial discrimination to management.  On the other hand, all of the acts alleged in Thrasher's EEOC charge are predicated upon Thrasher's November of 2001 complaint to the corporate office of racial discrimination.

Moreover, since these retaliatory acts alleged for the first time in Thrasher's complaint occurred well before the retaliatory acts alleged in Thrasher's EEOC charge, they obviously did not "grow out of" the allegations made in Thrasher's EEOC complaint.   Since Thrasher failed to include in his EEOC charge the

allegations of retaliatory conduct which allegedly occurred prior to November 28, 2001, he has failed to exhaust his administrative remedies with respect to a retaliation claim premised on the pre-November 2001 retaliatory acts.[7]

Even if Thrasher had alleged these retaliatory acts in his EEOC charge, they are still time-barred in this Title VII action.   Not only does Title VII require a claimant to file an EEOC charge before proceeding to federal court, but a claimant must file that charge with the EEOC within a statutory time period. 42 U.S.C. §2003-5(e); See also Calloway v. Partners National Health Plans, 986 F.2d 446, 449 (11th Cir. 1993)(holding that the timely filing of a charge of discrimination is a prerequisite to bringing a private suit under Title VII.)  If a plaintiff institutes a Title VII action in a state, such as Florida, which has a state agency in place with the authority to grant or seek relief from the alleged discriminatory practice, an employee must file a charge with the EEOC within 300 days after learning of an allegedly unlawful practice or incident. 42 U.S.C. §20003-5(e);   See Maynard v. Pneumatic Products Corp., 256 F.3d 1259, 1262 (11th Cir. 2001); Thomas v. Florida Power & Light Co., 764 F.2d 768, 770 (11th Cir. 1985).

---

[7] Thrasher's reliance on Watson v. Bally Mfg. Corp., 844 F. Supp. 1533 (S.D. Fla. 1993) is misplaced.  In Watson the district court refused to dismiss a retaliation claim for failure to exhaust administrative remedies, where the plaintiff represented that an examination of the actual EEOC investigation would reveal that the Commission did in fact investigate the claims not included in the EEOC charge.  Importantly, in Watson, the district court was considering a motion to dismiss, rather than a summary judgment motion.  The Watson Court recognized that even though the plaintiff carried the burden of ultimately substantiating this representation regarding the EEOC investigation, it was inappropriate when evaluating a motion to dismiss to require the plaintiff to prove his case.  In stark contrast, when faced with a summary judgment motion, as in this case, the plaintiff carries the burden of bringing forth at least some evidence to substantiate his claim that the EEOC actually did investigate the retaliatory conduct not included in his EEOC charge.  Here, Thrasher has not met this burden, and has in fact failed to offer any evidence pertaining to the scope of the EEOC's investigation.

It is undisputed that Thrasher's first EEOC charge was filed on September 10, 2002, so retaliatory acts which occurred more than 300 days earlier, or before November 23, 2001, do not fall within the statutory time frame.  In addition, these retaliatory acts alleged in Thrasher's complaint also occurred more than 300 days before Thrasher filed a charge with the EEOC.  Despite this fact, Thrasher argues these claims are not time-barred, relying on cases which have held that an exception to the 300-day filing requirement arises where the discriminatory acts constitute a "continuing violation."  Roberts v. Gadsen Memorial Hospital, 835 F.2d 793, 799 (11th Cir. 1988)("To revive the otherwise time-barred claims under the doctrine, however, it must be part of a pattern or continuing practice of which the timely-filed incident arose.")  Under the "continuing violation" doctrine, Title VII's statute of limitation is extended to allow the inclusion of all acts contained within a policy of ongoing discrimination.  See Id.; Beavers v. American Cast Iron Pipe Co., 975 F.2d 792, 796 (11th Cir. 1992).  Thrasher argues that the otherwise time-barred retaliatory acts were part of a continuing pattern of retaliation.

Thrasher's reliance on the "continuing violation" doctrine is precluded by the Supreme Court of the United States' decision in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 113, 122 S. Ct. 2061, 2072, 153 L. Ed. 2d 106 (2002). In that case, the Supreme Court specifically held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act."  Id.[8]   In National Railroad, the Supreme Court distinguished between a hostile work environment case, which by its very nature involves repeated conduct, and a retaliation claim, where each retaliatory act

_____

[8] However, the National Railroad Court also recognized that an employee may use the prior acts as background evidence in support of a timely claim.  Nat'l Railroad v. Morgan, 536 U.S. 101, 113, 122 S. Ct. 2061, 2072, 153 L. Ed. 2d 106 (2002).

constitutes a separate actionable "unlawful employment practice." Id. at 115, 122 S. Ct. at 2073.  The Supreme Court reasoned that the Title VII statutory scheme requires an employee to report "an unlawful employment practice" within the statutory time period, and a discrete act of retaliation is an "unlawful employment practice" within the meaning of the statute.  In fact, the National Railroad Court specifically stated that "(d)iscrete acts such as termination, *failure to promote*, denial of transfer, or refusal to hire" are easy to identify, and constitute separate actionable practices which start the clock on Title VII's statute of limitations. Id. at 114, 122 S. Ct. at 2073 (emphasis added).

In this case, since Thrasher first filed his EEOC charge on September 10, 2002, only those alleged retaliatory acts which occurred 300 days prior, or after November 23, 2001, are actionable.[9]  Thus, L-3 is entitled to summary judgment with respect to the allegations in Thrasher's second amended complaint that L-3 unlawfully retaliated against him in February, August, and October of 2001.

### C.   Retaliation based on Plaintiff's Opposition to the 2001 Employee of the Quarter Award

This case presents the unusual situation of a racial discrimination claim founded upon alleged discrimination toward another person.  Title VII's anti-retaliation provision makes it an unlawful employment practice to discriminate

---

[9] The Florida Civil Rights Act ("FCRA") requires a plaintiff to file a charge of discrimination with the Florida Commission within three-hundred sixty-five (365) days of the alleged discrimination, rather than the three hundred days required by Title VII. See Fla. Stat. §760.11(a) (2004).  The FCRA extended statutory deadline does not affect the plaintiff's claims, however, because he did not even arguable include a complaint that he was denied a promotion in October of 2001 until he amended his EEOC charge in February of 2003.  Even so, the plaintiff's FCRA retaliation claim is in all other respects analyzed under the same framework as his Title VII claim. Therefore, the October incident would still be barred because plaintiff did not include it in his EEOC charge, as discussed *supra*.

against an employee because he has "opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. §2000e-3(a).  To recover for retaliation, the plaintiff must initially demonstrate that: 1) he engaged in a statutorily protected activity; 2) he suffered an adverse employment action; and 3) a causal connection exists between the protected activity and the adverse employment action.  Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002);   See 42 U.S.C. §2000e-3(a).

L-3 asserts that to the extent Thrasher's retaliation claim is based on his complaint to management in 2001 that Elijah Snipes did not win the employee of the quarter award due to racial discrimination, Thrasher has failed to establish the first element of a prima facie case - - - that he engaged in statutorily protected activity.   An employee's complaints to management about unlawful employment practices may constitute "statutorily protected activity."  Lipphardt v. Durango Steakhouse, 267 F.3d 1183, 1187 (11th Cir. 2001)(citing 42 U.S.C. §2000e-3(a); See also,  E.E.O.C. v. Total System Services, Inc., 221 F.3d 1171, 1174 (11th Cir. 2000).  However, it is also well established that a plaintiff must show that he "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices."  Weeks v. Harden Mfg. Corp., supra, 291 F.3d at 1311-12 (citing Little v. United Tech., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997)).  In Little, the Eleventh Circuit explained,

>  "It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component.   A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented.   It thus is not enough for a plaintiff to allege that his belief is this regard was honest and bona fide; the

allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable."

Little, supra, 103 F.3d at 960.

With respect to his subjective belief that discrimination occurred, Thrasher testified that prior to and after the 2001 employee of the quarter award, Thrasher had witnessed Bill Bailey, as well as other supervisory employees, use racially derogatory remarks and treat Snipes in what he believed to be a racially discriminatory manner.

L-3 does not dispute Thrasher's subjective belief that racial discrimination occurred, but argues that Thrasher's complaint was not objectively reasonable.  To this end, L-3 points out that nominees for the employee of the quarter award are named by the employees - - - not management.  Bill Bailey testified that by specific design, the employee of the quarter selection process is totally employee driven. Bailey explained that employees from each shop within the company nominate a fellow employee from their shop for the award.   Following the employees' selection, a supervisor endorses the nomination of the employee by writing up a short description of the employee's qualifications for employee-of-the-quarter, but the supervisor does not decide which employee is nominated or selected.  Next, an employee from each shop is selected to attend an employee of the quarter committee meeting where the employees collectively discuss the nominees, but each employee may act as an advocate, promoting the nominee from his or her particular shop and expounding on the particular employee's qualifications.  The committee selectee chosen to attend the meeting is selected by management from volunteers or whoever is available at that time, depending on the current workload. After the employees in the meeting vote on the ultimate winner of the award, management's only role is to recognize the winner.  Therefore, according to L-3, Thrasher could not reasonably have believed that the failure of the company's

employees to choose Snipes as the employee of the quarter could be attributed to actions on the part of the company itself.

In Little v. United Technologies, supra, 103 F.3d at 959-60, the Eleventh Circuit held that an employee's opposition to a racially discriminatory remark made by a co-employee was not objectively reasonable because the remark could not be attributed to the employer.   The Little Court reasoned that an employee's opposition to a co-worker's individual, discriminatory act does not fall within the protection of Title VII because Title VII prohibits discriminatory acts on the part of the employer, not co-employees.  Id. at 959.

Thrasher counters that management does actually play an integral role in the employee of the quarter selection process because management must endorse the nomination of the employee and select which employee attends the committee meeting.   Thrasher testified that he believed racial discrimination was involved because he had nominated Elijah Snipes for the award on several occasions, but each time he nominated Snipes, Thrasher's supervisor, Bill Bailey, did not send an employee representative to the committee meeting to advocate on Snipes' behalf. According to Thrasher, because Snipes worked in a small, confined area, the other employees attending the employee of the quarter meeting and responsible for voting would be completely unaware of the quality of Snipes' work for which Thrasher nominated him.[10]   Since there would be no one in attendance at the meeting to represent Snipes, in Thrasher's view, the employees' failure to select Snipes was assured.

Thus, it appears that Thrasher's complaint of racial discrimination was not necessarily based on the employees' ultimate selection, but instead it stemmed

---

[10]  Further, according to Thrasher, Bailey was reprimanded in an e-mail from Bailey's supervisor for failing to send someone from his shop to advocate for Snipes, but Thrasher offers no evidence to establish this otherwise inadmissible hearsay.

from his belief that L-3's management had intentionally failed to send a representative to the employee committee meeting in an attempt to thwart Snipes' opportunity of winning.  For example, after stating that he had nominated Snipes for the award on previous occasions, Thrasher explained, "That's why I complained. Because now two times in a row you [referring to Bailey] didn't do it. That's why I got concerned.  The first time you didn't send nobody over there, okay, that can be a slip.  The second time, that's when I said huh-uh."  Certainly, Thrasher may not have been able to prove a racial discrimination claim with respect to the 2001 employee of the quarter awards, and his belief may have been mistaken, but that is not his burden in this retaliation claim.  Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1388 (11th Cir. 1988).  The facts do show that Snipes' work unit may not have been represented at the meeting.  Accepting Thrasher's testimony as true and viewing it in the light most favorable to him, Thrasher's belief that his supervisor acted in a discriminatory manner was objectively reasonable.

The only non-time barred retaliatory acts remaining which are predicated on Thrasher's complaint of racial discrimination in the 2001 employee of the quarter process are his allegation that he was suspended on November 28, 2001, and his allegation that L-3 removed his weight and balance certification on May 20, 2002. L-3 argues that even if Thrasher engaged in statutorily protected activity in 2001, as a matter of law Thrasher has failed to establish a causal connection between his November 2001 complaint of racial discrimination and any of the alleged retaliatory acts which occurred in 2002.[11]  L-3 points out that the seven-months time span between Thrasher's report of racial discrimination and the first alleged retaliatory

---

[11] As will be discussed below, Thrasher reported racial discrimination to management again on May 21, 2002, June 6, 2002, and July 30, 2002.  Therefore, any alleged retaliatory acts occurring after May 21, 2002, would be predicated upon his opposition to racial discrimination on those dates, as opposed to his November 2001 complaint.

incident which occurred in 2002 is insufficient to create an inference of a causal connection based on temporal proximity.  Indeed, courts have held that in order to establish a casual connection through temporal proximity, the protected activity and the adverse employment action must be "very close." Clark County School District v.  Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001);  Higdon v. Jackson, 393 F.3d 1211, 1221 (11th Cir. 2004)(3 months gap between plaintiff's protected conduct and the adverse employment action insufficient to establish causal connection); Wascura v.  City of South Miami, 257 F.3d 1238, 1244-45 (11th Cir.  2001) (3½ months period insufficient); Conner v. Schnuck Markets, Inc., 121 F.2d 1390, 1395 (10th Cir. 1997) (four-months span between protected activity and termination insufficient to justify an inference of causation).

Thrasher has not presented any other evidence of causation between the November 2001 complaint and the May 2002 removal of his name from the weight and balance certification list.  Thrasher argues that since he was absent from work due to a work-related injury from December 10, 2001, to May 13, 2002, there were valid reasons why the adverse employment action could not be taken immediately; therefore, the seven-months gap between his protected activity and this particular incident of retaliation does not, as he argues, *disprove* causation. Kachmar v. Sunguard Data Systems, Inc., 109 F.3d 173, 177 (3d Cir. 1997). However, the plaintiff's argument has at least two fallacies.  First, Thrasher does not even attempt to explain why his absence from work due to disability would have forestalled L-3's opportunity or ability to remove his name from a list of employees qualified to perform weight and balance duties.   Such an absence, alone, may be a reasonable basis for one to lose a certification due to inactivity. Further, even if the absence of a close temporal connection does not *disprove* causation as Thrasher suggests, Thrasher has failed to offer any evidence to *prove*

a connection between his statutorily protected activity and the alleged retaliatory act.  Accordingly, as a matter of law, Thrasher has failed to establish a prima facie case of retaliation predicated upon the May 20, 2002, removal of his name from the weight and balance certification list.

Thrasher's November 28, 2001, suspension occurred only several days after his complaint about the 2001 employee of the quarter award to corporate management.  Therefore, Thrasher has established a causal connection between his statutorily protected activity and his suspension.   L-3 contends that Thrasher's suspension was not retaliatory, but instead argues that he was suspended because he used abusive and profane language with a supervisor over the phone.  Once the defendant offers a legitimate, non-discriminatory reason for the adverse employment action, the burden falls upon the plaintiff to proffer evidence sufficient to create a genuine issue of material fact that the employer's articulated reason for its adverse employment action is pretextual.  Chapman v. AI Transport, 229 F.3d 1012, 1024-25 (11th Cir. 2000).  In this case, Thrasher disputes the fact that he used abusive and profane language with his supervisor.  Instead, he contends that his supervisor lied about the incident in order to retaliate against him.  Evidence creating a genuine issue of fact with respect to the truthfulness of the defendant's proffered explanation is sufficient to defeat a summary judgment motion.  Howard v. BP Oil Co., Inc., 32 F.3d 520, 525-26 (11th Cir. 1994); See also Arrington v. Cobb County, 139 F.3d 865, 874 (11th Cir. 1998)(holding that a plaintiff may show pretext by undermining the credibility of the defendant's proffered explanation).  Thus, Thrasher has created a genuine issue of fact regarding the truthfulness of L-3's proffered reason.

Based on the foregoing reasons, L-3 is not entitled to summary judgment with respect to Thrasher's complaint that his November 28, 2001, suspension was retaliatory.  However, the defendant is entitled to summary judgment with respect

to all other alleged retaliatory acts which occurred prior to May 22, 2002, and which are predicated on Thrasher's complaint that the 2001 employee of the quarter process was racially discriminatory.

### D.   Retaliation Based on Plaintiff's Complaint to Corporate Office of Discriminatory Demotion and Racially Hostile Work Environment

Thrasher's retaliation claim is also based on his contention that, in addition to his 2001 complaint of racial discrimination, he also opposed several unlawful employment practices in 2002.  First, Thrasher contends that after he returned from worker's compensation leave, he complained to corporate management that Elijah Snipes had been demoted due to racial discrimination.  Then, a couple of months later, he complained to corporate management that racially offensive e-mails, and sexually offensive jokes, e-mails and material were being distributed by management throughout the company.  Based on these complaints of unlawful employment practices, Thrasher contends that L-3 retaliated against him by counseling him for not taking lunch breaks, transferring him to an undesirable shift for approximately six weeks, and denying his vacation leave requests.[12]

L-3 does not argue that these later complaints of discrimination were not statutorily protected activity.  Instead, L-3 argues that the remaining retaliatory acts which Thrasher alleges to have followed his 2002 discrimination complaints do not qualify as adverse employment actions, and even if they could be considered adverse employment actions, L-3 contends that Thrasher has failed to rebut L-3's legitimate, non-discriminatory reasons for taking these actions.

---

[12] Plaintiff's complaint also alleges that his telephone calls were "monitored" as a result of his discrimination complaints to the corporate office, but plaintiff does not even mention this allegation in either his deposition testimony submitted to the court or in his affidavit.  Allegations contained in the complaint must have evidentiary support in order to survive summary judgment.

     1.   <u>Shift Transfer</u>

Thrasher complains that on August 19, 2002, he was temporarily transferred from the day shift to the night shift, even though he had seniority over the person who remained on the day shift.  Thrasher does not dispute that the person who remained on the day shift was training a new employee, but argues that the shift transfer was retaliatory because the training employee should have been transferred to the night shift.  To satisfy the adverse employment action element, the action must either be "an ultimate employment decision or else must meet some threshold level of substantiality."  <u>Stavropoulos v. Firestone</u>, 361 F.3d 610, 617 (11th Cir. 2004).  An ultimate employment decision includes decisions such as termination, failure to hire, or demotion.  <u>Id.</u>  Here, it is undisputed that Thrasher's transfer to another shift is not an ultimate employment decision, as it did not decrease his pay, result in his termination, or otherwise demote him.

Thus, the shift change must meet some threshold level of substantiality to constitute an adverse employment action.  To rise to the level of substantiality required in a retaliation claim, the employee must present evidence of an objectively serious and material change in the terms, conditions, or privileges of employment.  <u>Davis v. Town of Lake Park</u>, 245 F.3d 1232, 1239 (11th Cir. 2001); <u>Gupta v. Florida Bd. of Regents</u>, 212 F.3d 571, 587 (11th Cir. 2000).  "Moreover, an employee's subjective view of the significance and the adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances."  <u>Davis v. Town of Lake Park, Fla</u>, <u>supra</u>, 245 F.3d at 1239.

Significantly, the Eleventh Circuit has held that a lateral transfer which does not involve a demotion in form or substance does not rise to the level of an adverse employment action.  <u>See</u> <u>Doe v. Dekalb County School Dist.</u>, 145 F.3d 1441, 1449 (11th Cir. 1998).  The Eleventh Circuit explained, "[I]t is not enough that a transfer

imposes some de minimis inconvenience or alteration of responsibilities." Id. at 1453. However, a transfer in position that involves a loss of pay, prestige or responsibility may be adverse. Hinson v. Clinch County, Ga. Bd. of Educ., 231 F.3d 821, 828 (11th Cir. 2000).

Here, the record establishes that Thrasher's responsibilities remained the same while on the different shift, and he was transferred back to the day shift after only six weeks with no intervening loss of pay or prestige. While Thrasher may have preferred to remain on the day shift, "an employment action is not adverse merely because the employee dislikes it or disagrees with it." Doe, supra, 145 F.3d at 1448. Thus, the record reflects that Thrasher's temporary transfer to another shift does not constitute a serious and material change in the terms, conditions, or privileges of his employment.

Even if Thrasher's temporary transfer to another shift did qualify as an adverse employment action (which it does not), L-3 would still be entitled to summary judgment because Thrasher has failed to rebut L-3's legitimate, non-discriminatory reason for the transfer. Once a plaintiff has established a prima facie case, thereby raising an inference that he was the subject of intentional discrimination, the burden shifts to the defendant to rebut this inference by presenting legitimate, non-discriminatory reasons for its employment action. Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir. 1997) (citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). This intermediate burden is "exceedingly light." Id. Once the defendant satisfies this burden, the presumption of discrimination is then rebutted and the employer is entitled to summary judgment unless the plaintiff proffers evidence sufficient to create a genuine issue of material fact that discrimination was actually the reason for the challenged action. Id. at 1564.

L-3 asserts that the shift change was only a temporary change to accommodate legitimate managerial needs.  Specifically, management wanted a new employee to be trained by Cheryl Pinko, who filled the "Lead A" position at the time.  The "Lead A" person is a non-managerial employee responsible for distributing the workload for the work center and ensuring that the work is complete and accurate.  L-3 asserts that the company has a policy of keeping the Lead A employee on the first shift, or the day shift.  To facilitate this policy, it was necessary to temporarily move Thrasher to another shift because each shift, by specific design, only requires two employees, at most.  Furthermore, after being informed by management that she would be training a new employee, Pinko advised management that she could not perform her Lead A job responsibilities adequately on a different shift due to the decreased contact with supervisors. According to Susan Garrison, a manager with L-3, Pinko's supervisors agreed.

To establish pretext, Thrasher argues that the company's policy of keeping the Lead A person on day shift came about only after Pinko became Lead A. In support of this argument, Thrasher points out that when Elijah Snipes was Lead A, he trained another employee on the second shift.[13]  Significantly, however, Snipes explained that it was his decision to train new employees on different shifts out of concern that the new employee should learn to handle the problems he or she may face on the shift they will eventually work.  In other words, Snipes did not request to remain on day shift, as Pinko did.  Further, Snipes noted that when he was Lead A, there was a different supervisor in charge of making the decision of whether

---

[13]  To the extent that plaintiff suggests that the decision to accommodate Pinko, rather than Snipes, is racially motivated, it should be noted that plaintiff's Title VII claim is based on the defendant's retaliation towards the plaintiff.   Therefore, even if plaintiff could prove that racial discrimination in some part motivated the defendant's decision to accommodate Pinko, rather than Snipes, this is immaterial to plaintiff's claim that defendant transferred him based on a retaliatory motive.

Lead A should remain on the day shift while training new employees.  In fact, Snipes testified that at the time he occupied the Lead A position, it was his choice to transfer to different shifts while training new employees, and management generally tended to give him free range due to the fact that the company was "in great need" at the time.  Significantly, "different supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important."  <u>Rojas</u>, <u>supra</u>, 285 F.3d at 1343.  Thus, Thrasher has failed to rebut L-3's legitimate, nondiscriminatory reason for temporarily transferring him to another shift while Pinko trained a new employee.  Accordingly, L-3 is entitled to summary judgment to the extent Thrasher's retaliation claim is predicated upon his August 2002 transfer to another shift.[14]

2.    <u>Denial of Leave Requests</u>

Similarly, the denial of an employee's leave request, standing alone, does not generally constitute an adverse employment action.  <u>See</u> <u>e.g.</u>, <u>Wynn v. Paragon Systems, Inc.</u>, 301 F. Supp. 2d 1343 (S.D. Ga. 2004)(denial of vacation request does not qualify as a serious and materially adverse change in terms and conditions of employment.); <u>Johnston v. Henderson</u>, 144 F. Supp. 2d 1341(S.D. Fla. 2001)(holding improper denial of sick leave did not rise to the level of an adverse employment action); <u>Montgomery v. City of Birmingham</u>, No. 98-AR-2100-S, 2000 WL 1608620, *7 (N.D. Ala. Jan 20. 2000)(noting that it was "unlikely" that a denial of one day of vacation leave was an adverse employment action).

---

[14] Additionally, plaintiff's complaint alleges that he was "counseled" for not taking lunch breaks.  As noted in <u>Davis v. Town of Lake Park, Fla</u>, <u>supra</u>, 245 F.3d at 1239, however, plaintiff's counseling clearly does not constitute an adverse employment action.  Plaintiff did not suffer any harm from the counseling, such as loss of pay or demotion, and plaintiff has not even alleged that this counseling had any adverse impact on his employment.

Whether an action is sufficient to constitute an adverse employment action for purposes of a retaliation claim should be determined on a case-by-case basis, Gupta, supra, 212 F.3d at 586, but the Eleventh Circuit has emphasized that an employee must show a "*serious and material* change in the terms, conditions, or privileges of employment."  Davis v. Town of Lake Park, Fla, supra, 245 F.3d at 1239 (emphasis added).  Viewed in isolation, or even collectively, without more, the denial of Thrasher's vacation leave requests on only a few occasions, do not rise to the level of a serious change in the terms of Thrasher's working conditions or privileges to satisfy Title VII standards for adverse employment action.  While there may be situations in which a leave request denial rises to the level of an adverse employment action, this is not the case.  This is especially true in light of Thrasher's testimony that he has taken a great deal of vacation time, and used many vacation hours to deal with the legal issues involved in this case.  Thrasher does not contend that the defendant has denied any of his admittedly numerous leave requests other than the few requests submitted in 2002.  At that time, Thrasher submitted five separate leave requests for five consecutive Fridays.  Of those five requests, only two were denied.  Since that time, Thrasher has not contended that any of his leave requests have been denied.

Moreover, in reference to at least the first vacation leave request, for one week, Thrasher has failed to establish that L-3's legitimate, non-discriminatory reason for denying his vacation leave was actually a pretext.  L-3 contends that Thrasher's vacation leave request for five days, from August 19 through August 23, 2002, was denied because Thrasher failed to submit the request in a timely manner.  Specifically, under the terms of Thrasher's Collective Bargaining Agreement ("CBA"), vacation leave requests in excess of eight hours must be

submitted to a supervisor at least seven days prior to the requested time period.[15] Thrasher submitted his request on August 13, 2002, which is less than the seven-day advance notice requirement.  Bill Bailey testified that the company is bound to adhere to the CBA advance notice requirements.

Thrasher does not dispute that he did not give his supervisor seven days advance notice regarding his vacation request for August 19 - 23, 2002.  Instead, in order to establish pretext, Thrasher simply asserts that even if he did not submit his leave requests within the advance notice time requirements mandated by the CBA, it was the normal practice of L-3 to grant leave to employees despite the CBA requirements, subject to the such considerations as whether other employees were also on leave.  A plaintiff may establish pretext by showing that the defendant's proffered legitimate, non-discriminatory reason is not worthy of belief.  Burdine, supra, 450 U.S. at 256, 101 S. Ct. at 1095.   However, "because the plaintiff bears the burden of establishing pretext [for discrimination], he must present 'significant probative' evidence on the issue to avoid summary judgment." Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996)(citing Isenbergh v. Knight-Ridder Newspaper Sales, Inc., 97 F.3d 436, 443-44 (11th Cir. 1996); See Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir 2001)(holding that the ultimate burden rests on the plaintiff to show that the employer's stated reason is a pretext for unlawful retaliation.)

Here, Thrasher offers no evidence to substantiate his assertion that L-3 routinely grants leave requests which were in violation of the CBA notice requirements, and he presents no evidence of other employees who were granted leave requests made outside the seven day advance notice window.   There are

---

[15] According to Thrasher, he did not grieve these vacation request denials with his union because the collective bargaining agreement indicates that it is up to the company's discretion whether to grant or deny vacation leave.

obvious scheduling reasons for the notice requirement, especially in a small work unit such as the plaintiff's.  Thrasher's own unsubstantiated assertions are inadequate to satisfy the non-movant's burden in a motion for summary judgment.  See Celotex v. Catrett, supra, 477 U.S. at 323, 106 S. Ct. at 2553.

Therefore, L-3 is entitled to summary judgment with respect to all of Thrasher's claims of retaliatory conduct which occurred in 2002.[16]

**III.   CONCLUSION**

For the foregoing reasons, the defendant's motion for summary judgment (doc. 33) is DENIED only to the extent plaintiff's federal and state law retaliation claims are predicated upon his November 28, 2001, suspension.  The defendant's motion is GRANTED as to all of the remainder of plaintiff's retaliation claims.  The Clerk is directed to enter judgment in accordance with this Order.

DONE and ORDERED this 23rd day of August, 2005.


/s/ Roger Vinson
**ROGER VINSON**
**Senior United States District Judge**

---

[16] In July of 2004, the plaintiff was suspended for creating a hostile work environment.  In his deposition and in his Response in Opposition to the Defendant's Motion for Summary Judgment, plaintiff asserts that this suspension was also in retaliation for his earlier discrimination complaints.  However, this recent allegation will not be considered as a predicate for plaintiff's present Title VII action.  A Title VII plaintiff is precluded from raising, in a deposition or a pre-trial motion, claims which were not alleged in the complaint.  Coon v. Georgia Pacific Corp., 829 F.2d 1563 (11th Cir. 1987); See also Pleming v. Universal-Rundle Corp, 142 F.3d 1354, 1357 (11th Cir. 1998)(holding that the "parties frame the scope of the litigation at the time the complaint is filed.")